## Case No. 9,594.
### MILLER v. The W. G. HEWES.
[1 Woods, 363.] [1]

Circuit Court, E. D. Texas. May Term, 1870.

COLLISION—NEGLIGENCE—DAMAGES—FOR WHAT ALLOWED.

1. It is no defense to a libel to recover damages resulting from a collision to say that nothing could be done at the moment to prevent it, if it could have been avoided by reasonable precautions or ordinary foresight.

2. Article 14 of the sailing regulations applied.

3. When a steamer through its own fault collided with a skiff in which were the libellant and his son, whereby the son was drowned and the libellant so seriously injured as to confine him to his bed for seven weeks, and render him unfit for labor until the date of the decree and partially disable him for life, and the skiff was broken, the court allowed as damages the necessary cost of repairs to the skiff with compensation for the loss of its use while undergoing repairs, the cost of the cure of libellant, also a sum of money as compensation for his sufferings, also a sum equal to the amount of such wages as the libellant with the aid of his son could have earned up to the time of the decree, and compensation for his permanent partial disability. The latter was arrived at by the present allowance of a sum equal to the amount of such income as the ordinary labor of libellant would produce for one-third of the period of his expectation of life according to the mortality tables.

[Cited in The Mineola, 44 Fed. 144. Followed in The William Branfoot, 48 Fed. 917.]

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

[Appeal from the district court of the United States for the Eastern district of Texas.]

W. P. Ballinger, T. M. Jack, M. F. Mott, and G. P. Finlay, for libellant.

F. H. Merriman and L. A. Thompson, for claimant.

BRADLEY, Circuit Justice. James Miller sues the steamer W. G. Hewes, and her master George E. Tripp, for damages in a case of collision, and the case appears to be as follows: On the 17th of February, 1868, about one o'clock, p. m., the day being clear, the libellant, with his son, was in a skiff, used as an oyster boat, in Matagorda Bay, at Indianola, just starting out for the Big Bayou to gather oysters. The steamer W. G. Hewes was at the same time leaving her wharf at Indianola for her trip to Galveston, loaded pretty well down (her captain says about 8½ feet) with the usual Texan cargo of cattle, hides, etc., and with passengers. The steamer was aground at her wharf, lying with her stern outward, and was obliged, first, to back out of her berth for some distance and then turn to the left, eastwardly, in a circular direction, until she was brought to her course, which was in a southeasterly direction. She then started on her way, in the general direction of the skiff. The wind, what little there was, had been ahead, and the skiff, it seems, was obliged to tack, but at this time she lay becalmed, from a quarter to half a mile from the wharf, and was drifting a little towards the shore. The libellant and his son, seeing the steamer starting, got their oars out to pull. The steamer, having started on her course, was now approaching the skiff at the rate of seven or eight knots an hour. The libellant, watching her, perceived, when she was about 200 yards from him, that she was making in the direction of the skiff, and fearing he would be run down, called out as loudly as he could: "For God's sake, stop the steamer, I can't get out of the way." Several passengers, on board the steamer, at the same time saw the danger the skiff was in, and the man on the lookout at her bow, or some other person there, called out to the pilot: "Stop the boat, there's a little boat right ahead." A voice, from the pilot house, answered: "D——n the little boat." The bell, however, was rung, to stop the steamer, and the captain says her engine was stopped; but her way could not be checked, and she struck the skiff. Previous to the collision several persons called to those in the skiff to jump overboard. The boy did so, and was drowned. The libellant remained in the skiff, which was much damaged, and filled with water and sank. The libellant himself was so much injured by the wheel of the steamer, that he was rendered helpless. He was picked up by a boat, sent from the steamer, and handed over to another boat which had put out from shore, and was taken home. The physician who attended him, says that

two ribs were broken on his right side, and all his ribs on the left side from the seventh down; and that he suffered a very severe rupture which renders a bandage necessary to keep his stomach and bowels from protruding, and which is not likely ever to be healed. The libellant suffered much pain; was confined to his bed for many weeks; and has become forever disabled from doing any hard work.

The captain of the steamer, to account for the collision, says that the steamer suddenly and unavoidably sheered to the right, and would not obey her helm. That the cause of this sheer was the low state of the water at the time—such that, with the draft of the steamer had, her keel was in the mud; that it is impossible to steer a vessel under such circumstances. That this is always the case when the vessel's bottom is near the bottom of the water. That he took the route he did, on this occasion, because of the lowness of the water; if the water had not been so low, the usual route would have been on the other side of a certain wreck, which was farther from the shore and farther from the position of the skiff.

This sheer of the steamer, which the captain calls "an abrupt and unavoidable sheer," is the only serious excuse offered for running down the skiff, and is the substantial defense on which the respondents rely. And yet, strange to say, this ground was not alleged in the original answer, sworn to by the captain; but is set up at the present trial, by way of amendment to the answer. Besides, it is an accident which the captain of the steamer, according to his own account, had reason to expect would happen. He says, himself, that these sudden sheers, and the disobedience of the vessel to the helm, always occur when the vessel's bottom is in contact with the mud —which he, of course, knew to be the case with his steamer at the time. How, then, if he knew this from his previous experience, can he set it up as an excuse? Ought he not to have guarded against this danger when about to overtake a small and helpless vessel lying becalmed, and unable to get out of his way? It seems to me that it was his duty to have slackened his speed, so that if he could not control his vessel's course, he might have controlled her motion. The sixteenth article of the sailing regulations, adopted by congress, by act of 29th of April, 1864, has a strong bearing on this question. It is as follows: "Every steamship, when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." 13 Stat. 58. Certainly the approach of the steamer towards the skiff, in this case, did involve risk of collision, if, as the captain says, he had reason to expect that he could not depend on his helm to govern the course of his vessel. This made it absolutely his duty, in approaching another vessel, to avoid such a speed as would prevent him from stopping and backing in case a sudden

sheer should render it necessary. The skiff was easily discernible. She was seen, not only by passengers on the steamer, but by persons on the wharf, long before the danger became imminent.

I cannot bring my mind to any other conclusion, than that the collision was caused by the fault of the steamer.

The question of damage is next to be considered. In the first place the amount of injury to the skiff required $75 to put her in repair, besides the time she was unfit for use. I will, therefore, allow $100 on that account. The physician's bill for attending the libellant was $300. That will also be allowed. The libellant's injuries were very severe and he suffered much pain, being confined to his bed for seven weeks. Such suffering cannot well be estimated at a money value. I shall allow the libellant $500 on this account. The value of his time from the period of the accident to the present, according to his statement (which is uncontradicted), would have been $4 a day including the aid given by his son. That is what he says he made at his ordinary employment. His injuries have rendered him unable to make more than 25 to 50 cents per day; and even this pittance is produced by the aid of his little children. I shall allow him $2 a day, making some allowance for sickness and slack work. For two years and three months this would amount to $1,400. These sums, in the aggregate, amount to $2,300.

Besides this, the libellant is entitled to compensation for being disabled for life. There is no fixed and settled rule for estimating the value of this injury. It depends on so many contingencies, that it is a thing of very difficult adjustment. A compensation based on a table of mortality would not be an accurate one, because a fixed sum of money, less than such a calculation would call for, received now, with the ability to invest and improve it at use, and also with ability to pursue some light business or trade, would enable the libellant to do better for his family, and lay up more for their use at his death than he would probably have done had he remained in health and in the pursuit of his ordinary employment. He is now forty-five years of age. The tables of mortality would indicate his expectation of life to be something near twenty-five years. Suppose he lived that period, the latter years would be feeble and inefficient. The present allowance of an aggregate sum, equal to the amount of an income such as his ordinary employment would produce for one-third of that time, would probably be more nearly equitable than the exact present value of such an income for life. Supposing, therefore, he could have annually realized, by said occupation, the sum of $700, after having deducted the value of his son's services. this sum in eight years would amount to $5,600. which, with the sum of $2,300, before allowed. would make in round numbers, $8,000—

exactly the amount decreed by the district court.

On the whole, therefore my opinion is, that the decree of that court should be affirmed, and that a decree for $8,000, besides costs, should be entered in favor of the libellant against the steamer, her tackle, furniture, etc.

See The Merrimac, 14 Wall. [81 U. S.] 203, decided in 1871, where the United States supreme court announces substantially the same rule as that stated in the first head note of this case.